IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID ALLEN,                          §
                                      §
      Plaintiff,                      §
                                      §
v.                                    §      CIVIL ACTION NO. H-13-1416
                                      §
CITY OF HOUSTON, CHARLES              §
MCCLELLAND, F. GALLEGOS,              §
J. MONTELONGO, A.H. CISNEROS,         §
                                      §
      Defendants.                     §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Defendants' Motion for Summary Judgment (Doc. 53) and Plaintiff's Motion for Summary Judgment (Doc. 58). The court has considered the motions, the responses, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendants' motion be **GRANTED IN PART AND DENIED IN PART** and that Plaintiff's motion be **DENIED**.

## I.  Case Background

Plaintiff filed this civil rights action against three police officers (collectively, "Defendant Officers"), the City of Houston ("Defendant City"), and Police Chief Charles McClelland ("Defendant McClelland"), alleging that they violated his First and Fourth Amendment rights during the course of each of three separate

_____

[1]      This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 25.

encounters with different police officers.[2]

## A.  Factual Background

Since at least 2010, Plaintiff has regularly engaged in street preaching[3] and/or sounding a shofar[4] in the vicinity of Planned Parenthood, City Hall, or other publicly or privately owned buildings within Defendant City.[5] Far from every occasion on which Plaintiff engaged in these activities resulted in an encounter with police officers, fewer still in his detention or arrest.[6]

The encounters at issue in this lawsuit occurred on May 16, 2011, October 31, 2011, and January 14, 2012.[7] Each of these encounters occurred while Plaintiff was street preaching.[8] On two of the three occasions, Plaintiff had a shofar in his possession.[9]

---

[2]     See Doc. 1, Pl.'s Complaint.

[3]     Plaintiff describes his actions while "street preaching" as evangelizing, including expressing his beliefs, "sharing his faith, glorifying the King, and expanding the kingdom." Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 13-16, 24.

[4]     "A shofar is a ram's horn trumpet that has religious and Biblical significance." Doc. 58-2, Ex. 1 to Pl.'s Mot. for Summ. J., Pl.'s Aff. ¶ 4. When Plaintiff sounded his shofar publicly, it was "to communicate a spiritual blessing and in some cases to ask for physical healing." Id. ¶ 6.

[5]     See Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 16-33, 42, 44-46, 51-52; Doc. 53-2, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep., Vol. 2, Dated July 29, 2014 p. 271.

[6]     See, e.g., Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 9-13, 16-18, 21-24, 27-28, 42-43, 44-46, 51-52.

[7]     See id. pp. 6-12.

[8]     Id. pp. 13-15.

[9]     See Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 75, 90; Doc. 54-1, Ex. 1-A to Defs.' Mot. for Summ. J., Video of May 16, 2011 Incident.

The accounts of what occurred during each of the three incidents at issue differ moderately between Plaintiff's version and each of Defendant Officers' versions.

    1.  <u>May 16, 2011</u>

During his lunch hour on May 16, 2011, Plaintiff engaged in "[s]idewalk counseling" and "saving lives" outside the Planned Parenthood building within the city limits of Defendant City.[10] Plaintiff did not have his shofar with him.[11]  Pro-life counselors were on the sidewalk, and Plaintiff was standing on a drainage culvert in the shade next to the sidewalk on the furthest driveway from the building.[12]

Defendant Felipe Gallegos ("Defendant Gallegos") became a Houston police officer in 2009.[13]  While in the Houston Police Academy, Defendant Gallegos took classes that covered First Amendment rights and other constitutional issues.[14]

Defendant Gallegos and Officer H. Castro were dispatched to investigate a complaint of criminal trespass at Planned

---

[10]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 33-34.

[11]    Doc. 54-1, Ex. 1-A to Defs.' Mot. for Summ. J., Video of May 16, 2011 Incident.

[12]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 34, 35.

[13]    Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. p. 12.

[14]    <u>See</u> <u>id.</u> pp. 14-15.

Parenthood.[15]   The allegation was that a male of Plaintiff's description was harassing clients.[16]   The officers arrived on the scene about 12:50 p.m. and found Plaintiff standing in the Planned Parenthood driveway.[17]

Defendant Gallegos and Officer H. Castro exited their vehicle and approached Plaintiff; Officer H. Castro then headed toward the building to conduct an investigation.[18]   Defendant Gallegos told Plaintiff that he was going to be detained while the officers conducted an investigation and asked Plaintiff to put his hands behind his back for handcuffing as an officer safety measure.[19] After cuffing, Defendant Gallegos escorted Plaintiff to the backseat of the patrol car and drove into the Planned Parenthood lot, parking "in front of the flagpoles, where there [was] no shade."[20]   Defendant Gallegos' testimony differed in that he reported that he parked in the shade.[21]   Defendant Gallegos stayed

---

[15]    Id. pp. 25, 26-30.

[16]    Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. pp. 25, 26-30.

[17]    Id. pp. 25, 26-30.

[18]    Id. pp. 42-43; Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 35.

[19]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 35; Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. pp. 39-40.

[20]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Vol. 1 Dated June 27, 2014 Dep. p. 35.

[21]    Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. p. 41.

in the front seat separated from Plaintiff by a Plexiglas partition.[22]  According to Defendant Gallegos, he asked Plaintiff whether he would prefer to have the partition opened and the air conditioning turned up or have the windows down, and Plaintiff chose air conditioning.[23]  According to Plaintiff, the partition was closed, and the back windows were down.[24]  By this time, Plaintiff, who was wearing a wool prayer shawl, had already been outside in the heat for about an hour.[25]

Plaintiff "immediately began to suffer a shortness of breath" and felt like he was "in trouble."[26]  Plaintiff started a conversation with Defendant Gallegos to "establish some kind of rapport."[27]  The two discussed their respective children and Defendant Gallegos' religious tattoos.[28]  The radio music bothered Plaintiff:

---

[22]    Id. p. 40; Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 38.

[23]    Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. p. 46.

[24]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 36-37.  The video of the incident shows the back windows up after Defendant Gallegos let Plaintiff out of the car.  See Doc. 54-1, Ex. 1-A to Defs.' Mot. for Summ. J., Video of May 16, 2011 Incident.

[25]    Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. p. 37.

[26]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 36.

[27]    Id.

[28]    See id.; Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. pp. 44-45.

And he — he had some music going, and it was a Latino boom da-da boom or something.  It was, you know, not my kind of music, and it was very unnerving; and I asked him, I said, "Would you please, turn off the radio, at least?"  "Just, please turn off the radio?"  And he said something to the effect of, "Hey, man, we're in my ride. We'll listen to my music.  And when you're" — "we're in your ride, we'll listen to your music."[29]

Then Plaintiff "began to get a little desperate;" his extremities began to tingle, and he "started to feel a little nauseous."[30]  Plaintiff advised Defendant Gallegos of these sensations.[31] Defendant Gallegos testified that Plaintiff said that he was hot and was having trouble breathing.[32]  Plaintiff "repeatedly asked for something to drink, some water" and was "repeatedly denied."[33]  Defendant Gallegos recalled offering some of his bottled water to Plaintiff.[34]

Defendant Gallegos stated that Plaintiff asked for an ambulance, and Defendant Gallegos called for one about 1:34 p.m.[35] Plaintiff stated that Officer H. Castro returned and told Defendant

---

[29]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Vol. 1 Dated June 27, 2014 Dep. p. 36.

[30]    Id.

[31]    Id.

[32]    Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. pp. 47-48.

[33]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 36.

[34]    Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. pp. 47-48.

[35]    Id. pp. 39, 40, 50-51.

Gallegos to let Plaintiff out of the car.[36]  According to Plaintiff,
Defendant Gallegos backed the vehicle into the shade before letting
him out.[37]  Plaintiff described what happened next:

> Officer Gallegos got out of the driver seat and opened my
> door.  I was right behind him.  And unassisted, I — I
> could not stand.  I, more or less, fell to my knees, on
> the side of the car.  I remember leaning up against the
> car.
>         . . . And then I'm on the ground, leaning against
> the car; and I said — And I needed to get on all fours,
> because I felt like I was going to throw up.  And if I
> didn't get my head down, I was going to pass out; and I
> didn't want to pass out.  And I asked to have the
> handcuffs removed, and I asked for water; and one of them
> said, "Oh, they have water inside, but we don't have any
> cups."
>         So I just, "Oh," indicating, and I rolled down to
> the — around the car, to get my head on the ground.  Now
> I'm looking up at the tailpipe, and I said, "Oh, God,
> turn off the car."  And one of them said, "We got to keep
> the air-conditioning going."[38]

About that time, an acquaintance of Plaintiff arrived with a camera
and began taking photographs and videotaping Plaintiff and the
officers.[39]  One of the officers said "Smile for the camera" and
removed the handcuffs per Plaintiff's request.[40]

Officer H. Castro returned at some point during this time.
While in the Planned Parenthood building, Officer H. Castro spoke

---

[36]     Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated
June 27, 2014 p. 37.

[37]     Id. p. 38.

[38]     Id. p. 37

[39]     Id.

[40]     Id. pp. 38-39, 41.

with the complainant and security personnel, viewed the security video, determined the property line, and spoke with someone in the district attorney's office.[41]   He reported to Defendant Gallegos that the district attorney had advised that a trespass charge could not be pursued against Plaintiff because he had been outside the Planned Parenthood gate.[42]   The officers released Plaintiff.[43]

The ambulance arrived at 1:40 p.m.[44]   The paramedics took Plaintiff's vitals and, according to Defendant Gallegos, found them to be "good."[45]   Plaintiff was taken to the hospital in the ambulance.[46]   Defendant Gallegos said that Plaintiff requested to go to the hospital, but Plaintiff said that he did not make that request.[47]   According to Plaintiff, the emergency personnel in the ambulance and later at the hospital would not give him any water "[b]ecause, I guess, when you have a heat stroke, you don't — you

---

[41]     See Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. pp. 42-44.

[42]     See id. pp. 43-44.

[43]     See id. pp. 43, 52.

[44]     Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 39; Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. p. 52.

[45]     See Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 41; Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. p. 52.  Plaintiff did not know whether his vital statistics were normal when the paramedics took them.  Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 41.

[46]     See id.

[47]     Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 41; Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. p. 52.

don't give water."[48]

At the hospital, the staff administered an electrocardiogram (EKG), repeatedly took Plaintiff's vitals, and kept him under observation.[49] He had been at the hospital approximately two hours waiting to see a doctor when, "[a]ll of the sudden" Plaintiff felt fine.[50] So, he used the restroom, tucked in his shirt, combed his hair, called his wife, and left the emergency room to join his wife and visit patients that he knew.[51] Plaintiff paid the ambulance and hospital bills, a total of about $1500.[52]

Plaintiff filed an Internal Affairs Division ("IAD") complaint against the officers.[53] Plaintiff refused mediation after the interview process and refused to provide a statement or sign a Complainant Waiver Form.[54] He stated that he was "done with it."[55]

2. October 31, 2011

During his lunch hour on October 31, 2011, Plaintiff was

---

[48]   Doc. 53-3, Ex. 2 to Defs.' Mot. for Summ. J., Def. Gallegos' Dep. p. 52.

[49]   Id. p. 53.

[50]   Id. pp. 53, 55.

[51]   Id. pp. 53-54.

[52]   Id. p. 56.

[53]   See Doc. 66-3, Ex. 5 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Issue Record Form.

[54]   Doc. 66-4, Ex. 6 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Investigation Summary pp. 2-3.

[55]   Id. p. 3.

street preaching at a bus stop on the corner of Montrose and Westheimer within the city limits of Defendant City.[56]  Plaintiff was with David Stokes ("Stokes") of Bulldog Ministries, a street-preaching ministry, and two other individuals.[57]  Plaintiff was "[w]itnessing, sharing [his] faith, blowing the shofar, passing out tracts."[58]

Defendant Juan Montelongo ("Defendant Montelongo") attended the Houston Police Academy in 2008 and received special training to become a volunteer officer for the Special Response Group ("SRG"), which handles protests.[59]  In the SRG training, Defendant Montelongo received training on ordinances related to protests, including Ordinance 28-33,[60] which describes what items may be carried in demonstrations, rallies, picket lines, or public assemblies.[61]

Before Defendant Montelongo arrived on the scene, another Houston Police Department ("HPD") police officer approached the group of street preachers to say that the police department had received a call complaining that one of their signs was blocking

---

[56]     Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 74-75.

[57]     Id. p. 74.

[58]     Id. p. 75.

[59]     Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. pp. 11, 13, 19-21, 70.

[60]     Houston, Tex., Code of Ordinances ch. 28, art. 1 § 33.

[61]     Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. pp. 67-68.

the sidewalk.[62]   He told Plaintiff and the other the street preachers that they were not doing anything wrong and that they were "free to do whatever [they were] doing."[63]   After that officer walked away, Defendant Montelongo arrived on the scene in response to a call of a disturbance/protest:

> And then another police car pulled in that I believe was Montelongo, and he came over very aggressively and just telling us, directing us, that, you know, we had to — we had to go, you know.
> Matter of fact, he reached out to take my shofar from me.  Just hadn't asked me what it was or anything; and I'm kind of close to my shofar, and I kind of pulled it away from him. . . .
> Then he kept on arguing with [Stokes], and [Stokes was] trying to tell him that we work with Officer Joe Cram [("Officer Cram")] from Criminal Intelligence Division [("CID")].[64]

In response to Plaintiff's comment that they were "spreading the Gospel of Jesus Christ," Defendant Montelongo stated that they had "the right to do that . . . all the right to do that."[65] Defendant Montelongo measured the signs with a template and decided that they did not comply with Ordinance 28-33.[66]  He told Stokes and

---

[62]   See Doc. 66, Ex. 3 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Oct. 31, 2011 Incident; see also Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. p. 24.

[63]   Doc. 66, Ex. 3 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Oct. 31, 2011 Incident.

[64]   Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 75; see also Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. p. 24.

[65]   Doc. 66, Ex. 3 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Oct. 31, 2011 Incident.

[66]   Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. pp. 25-27.

Plaintiff that they could not have the signs and gave them the opportunity to take the signs away or fix them so that they complied with the ordinance.[67]   Defendant Montelongo and Stokes argued about the application of Ordinance 28-33.[68]   Sergeant Hurley, Defendant Montelongo's supervisor, arrived during the argument over the signs.[69]   Defendant Montelongo and Sergeant Hurley stepped aside to discuss the situation.[70]

Stokes approached Sergeant Hurley, who then asked for Stokes' identification.[71]   Stokes raised his camera above Sergeant Hurley's head, which Sergeant Hurley perceived to be a threat.[72]   Sergeant Hurley's response was to "take [Stokes] down slowly to the point where [Sergeant Hurley could] put [Stokes] in handcuffs."[73]

At that time, according to Defendant Montelongo, Plaintiff headed into oncoming traffic on Westheimer, and Defendant

---

[67]     Id. pp. 28-29; Doc. 66, Ex. 3 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Oct. 31, 2011 Incident.

[68]     See Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. p. 30; Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 75.

[69]     Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 81-82; Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. pp. 30-31.

[70]     Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. pp. 30-31.

[71]     Id.

[72]     Id. p. 31-32.

[73]     Id. p. 31.

Montelongo yelled at him to get out of the street.[74]   Defendant
Montelongo explained his reaction:  "That's when I grab[bed] him,
pull[ed] him onto the sidewalk for his safety and for the safety of
traffic coming down eastbound on Westheimer."[75]  Plaintiff resisted
and fell onto his knees.[76]  Officer Brooks got involved and grabbed
one of Plaintiff's arms and handcuffed him.[77]  Defendant Montelongo
said that they took Plaintiff into temporary custody to keep him
safe while they decided how to proceed.[78]   Plaintiff, however,
denied that he ever entered or tried to enter the street and
claimed that he was taken down by one of the officers[79] and
handcuffed as soon as he got his cell phone out of his pocket to
videotape the officers' treatment of Stokes.[80]

Officer Brooks escorted Plaintiff to one of the police
vehicles.[81]  Stokes was placed in the backseat of a different police

---

[74]     Id. p. 32.

[75]     Id. pp. 32-33.

[76]     Id. pp. 33-34.

[77]     Id. pp. 35-36, 38.

[78]     Id. p. 36.

[79]     Plaintiff did not know which officer "took [him] down."  Doc. 53-1,
Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 80.

[80]     Id. pp. 76-77.  A witness corroborated Plaintiff's testimony.  See
Doc. 65-2, Ex. 1 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Robert Gomez's Dep.
¶ 5.

[81]     Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep.
p. 38.

vehicle.[82]  Defendant Montelongo spoke with Sergeant Hurley and then called the SRG division and attempted to contact the CID while Sergeant Hurley called the district attorney for advice regarding charges.[83]  The SRG officer with whom Defendant Montelongo spoke first confirmed that Defendant Montelongo had used the template to measure the signs and then advised him "to issue a citation and confiscate the signs and tag them to the Houston property room."[84] Defendant Montelongo conferred again with Sergeant Hurley.[85]

Plaintiff, who was sitting in the police vehicle while Defendant Montelongo and Sergeant Hurley were deciding what action to take, "began to feel the way [he had] felt at Planned Parenthood" and informed the officers,[86] who let him out of the car.[87]  "They took me out of the car, still in handcuffs, and they

---

[82]    Id. pp. 42-43; Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 77.

[83]    Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. pp. 40-41, 43, 44.

[84]    Id. p. 43.

[85]    Id. p. 44.

[86]    At his deposition, Plaintiff used the plural term "officers" but cannot recall to whom he complained.  See Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 84.

[87]    Id. p. 77; Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. p. 66.

sat me down on the curb, in the shade."[88]  The officers[89] called for an ambulance, which Plaintiff did not recall requesting.[90]  The paramedics' examination found Plaintiff's vital statistics to be normal, but they asked if Plaintiff wanted to go to the hospital; he declined, feeling better after the handcuffs had been removed.[91] Plaintiff did not receive any subsequent medical treatment relating to this incident.[92]

Defendant Montelongo issued a citation to Stokes for the signs and to Plaintiff for the shofar, which Defendant Montelongo did not know at the time had any religious significance, but had determined did not comply with the city ordinance.[93]  The citation was punishable by fine.[94]  The signs and the shofar were confiscated to be retrieved from the police station.[95]

---

[88]     Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 77.

[89]     At his deposition, Plaintiff again used the plural term "officers" to refer to whom it was who called for an ambulance.  Id.  Defendant Montelongo stated that he was at least 100 feet away from Plaintiff when the call for an ambulance was made and that he did not know which officer made the call.  Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. pp. 64-66.

[90]     Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 77.

[91]     Id.

[92]     Id. p. 87.

[93]     Id. p. 78; Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. p. 45.

[94]     Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. p. 49.

[95]     See id. p. 45.

Defendant Montelongo released Stokes and Plaintiff, who left the scene to resume their street preaching at Houston's City Hall.[96] Defendant Montelongo incorrectly completed the citations against Stokes and Plaintiff, and, as a result, Defendant Montelongo requested that the district attorney drop the charges.[97]

Plaintiff filed an IAD complaint against the officers.[98] Defendant Montelongo was exonerated on a allegation of excessive use of force, and the allegation of improper conduct was not sustained.[99]

### 3.   January 14, 2012

Plaintiff met Stokes on January 14, 2012, on the route of the Houston Marathon.[100]   Initially, Stokes spoke with Officer Cram from CID and another officer, with whom Plaintiff and Stokes "were fellowshipping . . . . laughing, having a high time."[101]   After those officers left, Plaintiff and Stokes positioned themselves "a

---

[96]     Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 78-79.

[97]     Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. p. 52.

[98]     See Doc. 66-6, Ex. 8 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Issue Record Form.

[99]     See Doc. 66-7, Ex. 9 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Employee Complaint History.

[100]     Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 87-88.

[101]     Id. p. 88.

couple of feet" from the curb and placed Stokes' signs nearby.[102] Plaintiff had his shofar.[103]

Stokes stood on the curb holding a large sign above his head.[104] A race official approached, stood in front of one of the signs, exchanging words with Stokes.[105] Officer Evangelina Gutierrez ("Officer Gutierrez") arrived at the location.[106] Plaintiff did not hear the conversation between Stokes and Officer Gutierrez but presumed that Stokes explained what they were doing and that he had spoken with Officer Cram.[107] Plaintiff began videotaping the encounter with Stokes' camera.[108] Officer Gutierrez called for assistance with "two extremely uncooperative males that were talking over her and wouldn't communicate with her" and were causing problems along the race route.[109]

Defendant Aaron Cisneros ("Defendant Cisneros"), an HPD sergeant, is in his nineteenth year with HPD and, in addition to

---

[102]    Id. pp. 88, 90.

[103]    Id. p. 90.

[104]    See Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident.

[105]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 90; see also Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident.

[106]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 90.

[107]    Id. pp. 90-91, 92-93.

[108]    Id. p. 91.

[109]    Doc. 53-5, Ex. 4 to Defs.' Mot. for Summ. J., Def. Aaron Cisneros' Dep. p. 64.

training at the Houston Police Academy, received training on handling protests.[110] He testified that officers are reminded that persons distributing religious literature are protected by the First Amendment with regard to the distribution but are not exempt from law related to being in the roadway.[111]

When he arrived, Defendant Cisneros spoke with Officer Gutierrez, who told him that a route security member had informed her that Stokes and Plaintiff were disrupting the runners.[112] Defendant Cisneros approached Stokes and Plaintiff and told them that they needed to "move away from the street with all that."[113] Plaintiff can be heard on the video suggesting that they "just move a little ways."[114] But Stokes verbally refused to move, and Defendant Cisneros said to Stokes, "Come on with me."[115] Defendant Cisneros leaned the sign that Stokes was holding against the wall between the sidewalk and the parking lot and escorted Stokes toward Defendant Cisneros' police vehicle, which was parked on a nearby

---

[110]    Id. pp. 23, 41, 45.

[111]    Id. p. 31.

[112]    Id. pp. 69-70.

[113]    Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident; see also Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 91.

[114]    Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident; see also Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 91.

[115]    Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident; see also Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 92.

street that had been blocked off at the race course.[116]  Plaintiff continued to videotape as he followed them.[117]

After Stokes and Defendant Cisneros neared the police vehicle and Stokes was standing with his hands on the trunk, Defendant Cisneros turned around and told Plaintiff, "I'm going to tell you. I do not want you near my police car.  I'm going to order you to go away.  If you do not go away, I'm going to put you in jail for interfering with a police investigation."[118]  Plaintiff stepped backwards back up on the curb and began to walk backwards while continuing to videotape.[119]  Defendant Cisneros then told Plaintiff, "If we are going to play the step-by-step game, I'm going to put you in the backseat of the car also."[120]  Plaintiff protested, claiming he was on a public sidewalk and asked what he was doing wrong.[121]  Defendant Cisneros took the video camera away from

---

[116]   See Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 90-92; Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident.

[117]   Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 97; see also Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident.

[118]   Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident; see also Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 97-98.

[119]   Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 pp. 97-98; see also Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident.

[120]   Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident; see also Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 98.

[121]   Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident.

Plaintiff, frisked him, and placed him in the backseat of the police vehicle with Stokes.[122]

After about ten or fifteen minutes, Defendant Cisneros let Stokes out of the car and escorted him about thirty feet where they had a conversation before Defendant Cisneros released Stokes.[123] Defendant Cisneros returned to Plaintiff and said, "Come with me. We're going to go have a chat back here."[124]   Plaintiff said, "I don't think so.  It's time to let me go."[125]  According to Defendant Cisneros, he told both men to stay away from the race course, about six or seven feet from where they had been and affirmed that they had a right to do what they had been doing at a greater distance from the course.[126]  Defendant Cisneros released Plaintiff who then joined Stokes on the sidewalk.[127]

Plaintiff took the video camera from Stokes to tape where they

---

[122]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 98; Doc. 53-5, Ex. 4 to Defs.' Mot. for Summ. J., Def. Cisneros' Dep. pp. 76-77; see also Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident.

[123]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 99; Doc. 53-5, Ex. 4 to Defs.' Mot. for Summ. J., Def. Cisneros' Dep. pp. 82-83.

[124]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 99.

[125]    Id.

[126]    Doc. 53-5, Ex. 4 to Defs.' Mot. for Summ. J., Def. Cisneros' Dep. pp. 81-82, 91-92, 124-25.

[127]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated June 27, 2014 p. 99.

had been held, walking toward Defendant Cisneros' police vehicle.[128]
As Plaintiff approached, Defendant Cisneros warned Plaintiff not to
enter the street again.[129]  Plaintiff denied that Defendant Cisneros
issued the warning not to enter the street.[130]   On the video,
Defendant Cisneros is heard saying, "Sir, if you come out in the
street again" and, as Plaintiff continued to move forward, "in
fact, come on."[131]   As Plaintiff entered the street,[132] Defendant
Cisneros arrested him, placed him in handcuffs, and escorted him to
the police vehicle to await another unit for transfer to the
jail.[133]  Defendant Cisneros issued Plaintiff a citation for failure
to obey a lawful order of a police officer directing traffic and
for the violation of Ordinance 28-33 by possessing a staff[134] while
participating in a demonstration.[135]   Defendant Cisneros missed

---

[128]    Id.

[129]    See Doc. 53-5, Ex. 4 to Defs.' Mot. for Summ. J., Def. Cisneros' Dep.
pp. 93-96; Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of
Jan. 14, 2012 Incident.

[130]    Doc. 53-1, Ex. 1 to Defs.' Mot. for Summ. J., Pl.'s Dep. Vol. 1 Dated
June 27, 2014 p. 101.

[131]    Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of
Jan. 14, 2012 Incident.

[132]    The video clearly indicates that Plaintiff entered the street and
approached Defendant Cisneros' police vehicle, and Plaintiff can be heard on the
video stating that he was "walking across the street."  Doc. 66, Ex. 4 to Pl.'s
Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident.

[133]    Doc. 53-5, Ex. 4 to Defs.' Mot. for Summ. J., Def. Cisneros' Dep. pp.
98-100.

[134]    Defendant Cisneros did not know at the time that the shofar had any
religious significance.  Id. pp. 60-64.

[135]    Id. pp. 110-14; see also Doc. 53-6, Ex. 4-C to Defs.' Mot. for Summ.
J., Citation Dated Jan. 14, 2012.

Plaintiff's court date, which had been reset, and the charge was dismissed.[136]

**B.  Procedural Background**

Plaintiff filed this action on May 15, 2013.[137] Plaintiff raised First and Fourth Amendment claims pursuant to 42 U.S.C. § 1983 ("Section 1983").

He alleged that all Defendants violated his First Amendment rights to free exercise of religion and to free speech by "target[ing] Plaintiff for selective and disfavored treatment because of Plaintiff's expressive religious activity" and "injur[ing] him in a way likely to chill a person of ordinary firmness from further participation in [a] protected activity."[138] Plaintiff further alleged that the seizure of his shofar for several hours at each of the incidents on October 31, 2011, and January 14, 2012, deprived him of his right to freedom of speech.[139] The court understands these allegations to raise a First Amendment retaliation claim.

Regarding violations of his Fourth Amendment rights, Plaintiff alleged that the seizure of his person in each of the three

---

[136]   Doc. 53-5, Ex. 4 to Defs.' Mot. for Summ. J., Def. Cisneros' Dep. pp. 113-14.

[137]   See Doc. 1, Pl.'s Complaint.

[138]   Id. pp. 13-14.

[139]   Id. pp. 15-16.  Plaintiff also cited the seizure of his shofar on May 16, 2011, as a violation of his First Amendment rights, but the undisputed facts indicate that Plaintiff did not have his shofar with him on that date.

incidents and the seizure of his personal property in each of the latter two incidents were "without probable cause or any other lawful authority."[140]   The court understands these allegations to raise a Fourth Amendment unreasonable seizure claim.

Plaintiff also complained that Ordinance 28-33 was applied to prevent him from blowing a shofar as an exercise of his Christian faith in violation of the First and Fourth Amendments.[141]   The court understands these allegations to raise a claim that Ordinance 28-33 is unconstitutional as applied to Plaintiff.

Plaintiff further alleged that Defendants' policy, practice, custom, and/or procedure of selectively prohibiting the sounding of a shofar and the use of a video camera violated his right to freedom of speech and that Defendant City's failure to adequately train and supervise its officers was the moving force behind violations of his First Amendment rights.   The enforcement of Defendants' arrest policy, Plaintiff pled, was also a moving force behind the violations of his First and Fourth Amendment rights.[142] The court understands these allegations to identify policies of Defendants City and McClelland that caused Plaintiff's alleged constitutional injuries.

As remedies, Plaintiff requested declarations that Defendants

---

[140]   Id. p. 19.

[141]   Id. pp. 13, 16.

[142]   Id. p. 20.

23

violated Plaintiff's constitutional rights, that "Defendants' acts, training, supervision, policies, customs, and/or procedures" violated Plaintiff's fundamental constitutional rights, and that Defendants' practice of "allowing its agents, servants, and/or employees to end constitutionally protected speech and religious exercise and to execute unlawful search and seizure is unconstitutional."[143]    Plaintiff asked the court to enjoin "Defendants' practice of allowing its agents, servants, and/or employees to end constitutionally protected speech and religious exercise and to execute unlawful search and seizure as set forth in this Complaint."[144]    Plaintiff further requested compensatory, nominal, and punitive damages, as well as reasonable attorney fees, costs, and expenses.[145]

All Defendants were served in September 2013: McClelland on September 11; Defendant Cisneros on September 12; Defendants Montelongo and City on September 13; and Defendant Gallegos on September 16.[146]    Defendants filed a joint answer on October 2, 2013.[147]    They raised several affirmative defenses to the

---

[143]    Id.

[144]    Id.

[145]    Id. p. 21.

[146]    See Doc. 9, Return of Serv. as to Def. Cisneros; Doc. 10, Return of Serv. as to Def. Montelongo; Doc. 11, Return of Serv. as to Def. City; Doc. 12, Return of Serv. as to Def. Gallegos; Doc. 13, Return of Serv. as to Def. McClelland.

[147]    See Doc. 14, Answer.

constitutional claims, including the defenses of qualified immunity for all officers and limitations only for claims emanating from the May 16, 2011.

After the case was referred to the undersigned and several discovery issues were resolved, both sides filed motions for summary judgment and motions to exclude the other party's expert testimony.[148]   The court issued an order on January 8, 2015, granting in part and denying in part each of the motions to exclude expert testimony.[149]   The court now addresses the pending motions for summary judgment.

## II.   Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).   The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.

---

[148]   See Doc. 25, Order Dated Apr. 29, 2014; Doc. 34, Min. Entry Dated May 22, 2014; Doc. 47, Min. Entry Dated Aug. 1, 2014; Doc. 48, Oral Order Dated Aug. 1, 2014; Doc. 53, Defs.' Mot. for Summ. J.; Doc. 56, Defs.' Mot. to Exclude Expert Test. of Steven Ashley; Doc. 57, Pl.'s Mot. to Exclude Expert Test. of Mark Eisenman; Doc. 58, Pl.'s Mot. for Summ. J.

[149]   See Doc. 73, Order Dated Jan. 8, 2015.

Fed. R. Civ. P. 56(c); <u>Celotex Corp.</u>, 477 U.S. at 323; <u>Topalian v.</u>
<u>Ehrman</u>, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the party opposing
summary judgment responds with evidence in support of each
challenged element, the case must be resolved at trial.  <u>Celotex</u>
<u>Corp.</u>, 477 U.S. at 324.

### III.   Section 1983 and Related Law

A plaintiff can establish a prima facie case under Section
1983[150] for the deprivation of civil rights by establishing: (1) a
violation of a federal constitutional or statutory right; and (2)
that the violation was committed by an individual acting under the
color of state law.  <u>Doe v. Rains Cnty. Indep. Sch. Dist.</u>, 66 F.3d
1402, 1406 (5th Cir. 1995).  The statute creates no substantive
rights but only provides remedies for deprivations of rights
created under federal law.  <u>Graham v. Connor</u>, 490 U.S. 386, 393-94
(1989).

Plaintiff's lawsuit raises the constitutional rights of free
expression and free speech under the First Amendment and freedom
from illegal seizure of person and property under the Fourth
Amendment.

---

[150]    The provision reads, in relevant part:

Every person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State . . . , subjects, or causes to be
subjected, any citizen of the United States or other person within
the jurisdiction thereof to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws,
shall be liable to the party injured in an action at law, suit in
equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

**A.   First Amendment**

The First Amendment[151] is violated when an official takes action against an ordinary citizen for engaging in protected conduct.   Kinney v. Weaver, 367 F.3d 337, 358 (5th Cir. 2004); see also Hartman v. Moore, 547 U.S. 250, 256 (2006); Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002).   "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."   Hartman, 547 U.S. at 256.   In order to succeed on a First Amendment retaliation claim, a plaintiff must show that: 1) he was engaged in constitutionally protected activity; 2) "the defendants' actions caused [the plaintiff] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity;" and 3) the defendants were "substantially motivated against the plaintiff['s] exercise of constitutionally protected conduct." Izen v. Catalina, 398 F.3d 363, 367 (5th Cir. 2005)(quoting Keenan, 290 F.3d at 258).

That said, the First Amendment does not protect individuals from arrests supported by probable cause, even if the motivation is

---

[151]    The language of the First Amendment is:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

retaliation.  See Reichle v. Howards, ____ U.S. ____, 132 S. Ct. 2088, 2093 (2012); Keenan, 290 F.3d at 261-62.  Where there is grounds to charge criminal conduct, "the objectives of law enforcement take primacy over the citizen's right to avoid retaliation." Keenan, 290 F.3d at 261-62.  "It is a traditional exercise of the States' police powers to protect the health and safety of their citizens." Hill v. Colorado, 530 U.S. 703, 715 (2000).  Additionally, the government may regulate features of speech unrelated to its content, such as "impos[ing] reasonable restrictions on time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." McCullen v. Coakley, ____ U.S. ____, 134 S. Ct. 2518, 2529 (2014)(quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989))(internal quotation marks omitted).

**B.  Fourth Amendment**

The Fourth Amendment[152] protects an individual from "unreasonable searches and seizures." U.S. Const. amend. IV.

---

[152]   The language of the Fourth Amendment is:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

28

"[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968).   The reasonableness of a seizure depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. pp. 19-20.

A warrantless arrest must be supported by "probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004).   However, police officers may detain an individual for investigative purposes based on the less demanding standard of a reasonable suspicion of criminal activity.   Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000).

"Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the seizure." U.S. v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006).   The analysis of whether the officer had reasonable suspicion "must be determined in light of the totality of the circumstances confronting [the] police officer, including all information available to the officer at the time of the decision to stop a person." Goodson, 202 F.3d at 736 (quoting United States v. Silva, 957 F.2d 157, 160 (5th Cir. 1992)).   The determination is made on

a case-by-case basis, considering whether the officers were unreasonable in failing to use less intrusive methods to ensure safety during their investigation. United States v. Campbell, 178 F.3d 345, 349 (5th Cir. 1999). Whether reasonable suspicion supported an investigative detention is a question of law for the court. Goodson, 202 F.3d at 737 (citing Silva, 957 F.2d at 159).

A prolonged investigative detention may reach a point where it is "tantamount to a de facto arrest" and must be based upon probable cause rather than merely reasonable suspicion. United States v. Zucco, 71 F.3d 188, 191 (5th Cir. 1995); see also United States v. Massi, 761 F.3d 512, 522 (5th Cir. 2014)("A detention initially authorized by Terry can, due to its duration, transform into the equivalent of an arrest."). The line between a valid investigative stop and an arrest requiring probable cause is a thin one. United States v. Hanson, 801 F.2d 757, 763 (5th Cir. 1986). Police detention constitutes an "arrest" if a reasonable person in the suspect's position would understand the situation to be a "restraint on freedom of the kind that the law typically associates with a formal arrest." Freeman v. Gore, 483 F.3d 404, 413 (5th Cir. 2007).

Whether a detention constitutes an arrest or merely an investigative detention depends on the reasonableness of the police action under the circumstances, including the scope and length of the investigation. Massi, 761 F.3d at 522 (quoting United States

30

v. Pack, 612 F.3d 341, 357 (5th Cir. 2010)).  The U.S. Supreme Court

explained:

> In assessing whether a detention is too long in duration
> to be justified as an investigative stop, we consider it
> appropriate to examine whether the police diligently
> pursued a means of investigation that was likely to
> confirm or dispel their suspicions quickly, during which
> time it was necessary to detain the defendant.

United States v. Sharpe, 470 U.S. 675, 686 (1985).  The Fifth

Circuit is clear that using force on a suspect, drawing a weapon,

ordering a suspect to lie on the ground, or placing the suspect in

handcuffs, either singly or in combination, do not automatically

convert a detention into an arrest.  Campbell, 178 F.3d at 349;

United States v. Sanders, 994 F.2d 200, 206 (5th Cir. 1993); see

also Estrada, 459 F.3d at 634-35.

### IV. Analysis

Plaintiff alleged violations of his First and Fourth Amendment

rights based on the assertion that he and his property were seized

by police without a proper legal basis while he was engaged in

activities of free speech and free exercise of religion for the

purpose of halting those activities.  In his response brief,

Plaintiff states his claims as follows: "Plaintiff has alleged that

officers violated his First and Fourth Amendment rights by stopping

his protected speech and free association, handcuffing him, and

detaining him in the back of police vehicles under unreasonable

31

conditions and without a proper legal basis."[153]

Defendants seek summary judgment on all claims based on the following arguments: 1) Plaintiff's claims based on the May 16, 2011 incident are barred by the applicable statute of limitations; 2) Defendant Officers are each entitled to qualified immunity; 3) Plaintiff cannot show that an official policy or custom of Defendant City was the proximate cause of any deprivation of Plaintiff's rights; and 4) Plaintiff cannot establish liability against Defendant McClelland for failing to supervise or train the officers or as a policymaker.[154]

Plaintiff seeks summary judgment on his First and Fourth Amendment claims associated with the May 16, 2011 incident. Plaintiff also seeks a ruling that Defendant City's Ordinance 28-33 has been applied to violate Plaintiff's free speech and free exercise rights.

The court begins with the statute-of-limitations issue and then addresses the parties' arguments regarding each officer's liability in the incidents.  In the final three sections, the court examines Defendant City's enforcement of Ordinance 28-33 and the liability of Defendants City and McClelland.

---

[153]    Doc. 65, Pl.'s Resp. to Defs.' Mot. for Summ. J. p. 17.

[154]    Defendants also moved for summary judgment, "[t]o the extent Plaintiff is attempting to establish a conspiracy claim . . . because[,] as a matter of law, City of Houston employees cannot conspire among themselves." Doc. 53, Defs.' Mot. for Summ. J. p. 31.  Plaintiff stated that he did not assert a conspiracy claim.  Doc. 65, Pl.'s Resp. to Defs.' Mot. for Summ. J. p. 34 n.2.

**A.   Statute of Limitations**

No express federal statute of limitations governs Section 1983 claims; therefore, federal courts borrow the limitations period from the law of the forum state.  <u>Stanley v. Foster</u>, 464 F.3d 565, 568 (5th Cir. 2006)(citing <u>Moore v. McDonald</u>, 30 F.3d 616, 620 (5th Cir. 1994)).   In Texas, the applicable limitations period is two years.  <u>Stanley</u>, 464 F.3d at 568 (citing <u>Moore</u>, 30 F.3d at 620); <u>see also</u> Tex. Civ. Prac. & Rem. Code Ann. § 16003(a).

For actions filed in federal court based on federal rights, the filing of a complaint pursuant to Rule 3 "suffices to satisfy the statute of limitations."[155]   <u>Henderson v. United States</u>, 517 U.S. 654, 657 n.2 (1996)(citing <u>West v. Conrail</u>, 481 U.S. 35, 39 (1987)).   This is true even when a federal court borrows a state statute of limitations to apply to a federal cause of action and that state's procedural rules require service of process before the limitations period expires.  <u>West</u>, 481 U.S. at 39; <u>see also</u> <u>McGuire v. Turnbo</u>, 137 F.3d 321, 324 (5th Cir. 1998)(finding a case based on federal law for which the state's statute of limitations had been borrowed was not subject to the state's service provisions).

Defendants argue that Plaintiff's claims relating to the incident on May 16, 2011, are barred by the applicable statute of limitations.   Plaintiff contends that, because the claims in this

---

[155]   The rule is different for federal actions based on state law, which are subject to the state's procedural requirement (if one exists) that service of process be made prior to the running of the statute of limitations.  <u>Henderson v. United States</u>, 517 U.S. 654, 657 n.2 (1996).

lawsuit are federal, the filing of the complaint was sufficient to satisfy the statute of limitations.

Plaintiff's action was commenced within two years of the May 16, 2011 incident and, thus, within the limitations period. Defendants are not entitled to summary judgment on this ground.

## B. __Defendant Officers' Liability__

Government officials have qualified immunity from Section 1983 "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).    Qualified immunity protects an officer regardless of whether the error was "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. at 231 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)).

By pleading qualified immunity in good faith, a summary judgment movant shifts the burden to the nonmovant to rebut the movant's assertion.    Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008); Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007). Although no longer mandatory, the process set out by the court in Saucier v. Katz, 533 U.S. 194 (2001), still provides guidance in analyzing qualified immunity.    See Pearson, 555 U.S. at 235 (stating that the Saucier analytic method "should no longer be

regarded as mandatory" but allowing that it may be "worthwhile in particular cases").

In order to overcome an assertion of qualified immunity, a plaintiff bears the initial burden of showing that the officer's conduct violated a constitutional right.  Hope v. Pelzer, 536 U.S. 730, 736 (2002); Brumfield, 551 F.3d at 326.  The inquiry ends if the allegations do not support a finding of constitutionally impermissible conduct.  Brumfield, 551 F.3d at 326.  If, however, the plaintiff satisfies this initial burden, the court determines whether the officer's actions were objectively reasonable in light of clearly established law at the time of the violation.  Pearson, 555 U.S. at 243-44; Goodson, 202 F.3d at 736.

In analyzing whether each of the officers is entitled to qualified immunity, the court begins its analysis of each incident with whether Plaintiff's evidence raises a question on the violation of Plaintiff's constitutional rights.  For each of Plaintiff's asserted constitutional claims, the critical issue is the same: whether each seizure was lawful.  If the seizures were legally supported, Plaintiff's First Amendment rights were not implicated.

1.  Defendant Gallegos on May 16, 2011

Both sides of this lawsuit move for summary judgment on the claims related to the incident on May 16, 2011. Defendants contend that Defendant Gallegos had reasonable suspicion for the temporary

detention during the investigation of the allegation of criminal trespass.   Plaintiff contends that the investigative detention of Plaintiff was of such intensity and scope as to have amounted to a de facto arrest that was not supported by probable cause.

The court finds that the officers were reasonable in their action and the investigative detention of Plaintiff did not rise to the level of an arrest.   Defendant Gallegos and Officer H. Castro arrived at the scene in response to a call regarding criminal trespass.   Because Plaintiff, who was standing in the driveway of the entrance to Planned Parenthood, matched the description of the alleged trespasser, the officers detained him by handcuffing him and placing him in the back of the police vehicle in order to investigate the complaint.   The officers' reliance on a specific description of an alleged trespasser provided them with reasonable suspicion to detain Plaintiff during the investigation.   See Estrada, 459 F.3d at 631 (requiring "specific and articulable facts" that reasonably warrant a seizure); Campbell, 178 F.3d at 348 (finding that the matching physical descriptions of a bank robber and a getaway car were sufficient facts to warrant further investigation).

Defendant Gallegos stayed in the patrol vehicle with Plaintiff while Officer H. Castro went into the Planned Parenthood building, where he interviewed the complainant, reviewed the security tape, and discussed charges with an assistant district attorney.   Officer

H. Castro conducted the investigation in no more than fifty minutes (the total amount of time between when the officers arrived and when the ambulance arrived).  Plaintiff was released when Officer H. Castro returned.  The fifty-minute detention lasted "no longer than required to effect the purpose of the stop" and was, therefore, reasonable as a matter of law.  See United States v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006)(citing United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005)).

Plaintiff argues that it was unreasonable to handcuff him and hold him in the backseat of a police vehicle for that length of time based solely on the complaint of an employee of the very organization he was peacefully protesting.  However, the officers would not have acted reasonably if they disregarded a citizen complaint merely because of its source.  Moreover, the evidence does not suggest that the officers had knowledge of Plaintiff's present or past activities at that location prior to their arrival and, in fact, only knew that a man fitting Plaintiff's description was accused of trespassing on Planned Parenthood's property.

The officers were justified in taking measures, including handcuffing Plaintiff and holding him in the back of the police vehicle, to assure their and Plaintiff's safety while investigating a complaint of criminal activity.  See Campbell, 178 F.3d at 349-50 (citing United States v. Hensley, 469 U.S. 221, 348-49 (1985), and recognizing an officer's right to protect his personal safety and

maintain the status quo during a <u>Terry</u> stop).  The facts do not suggest a more reasonable place for the officers to have detained Plaintiff during the investigation.  To have remained standing outside the car, potentially in the heat and in the public view, certainly would have presented its own set of problems.  The court finds that officers were not unreasonable in failing to use less intrusive procedures to detain Plaintiff.

Plaintiff's version of the facts about his detention does not alter the reasonableness of his seizure.  Plaintiff claims that, although the back windows of the police vehicle were open while he sat in the backseat, there was no breeze and that he was thirsty and in some distress.  He claims that he was never given any water despite his repeated requests and that he was not immediately relieved of the heat or of the constriction from the handcuffs upon his request.  Immediately prior to his detention, Plaintiff was standing outside in the heat in a wool prayer shawl.  The officers' placing him in the back of an open police vehicle did not convert the detention into an arrest merely because Plaintiff claimed to have become overheated.[156]

Plaintiff compares his detention to the arrest of Linda Freeman ("Freeman") as described in <u>Freeman</u>, 483 F.3d at 404.  The court finds significant differences between the circumstances of

---

[156]    The court notes that Plaintiff did not allege a claim for denial of medical treatment or any similar claim based on the conditions of detention.

Plaintiff's detention and that of Freeman.

In <u>Freeman</u>, sheriff's deputies attempted to serve a felony arrest warrant on Freeman's son at his mobile home. <u>Id.</u> at 408. Freeman lived next door and refused, on threat of arrest, the deputies' request to search her home. <u>Id.</u> The deputies responded by handcuffing Freeman and placing her in the back of the patrol vehicle. <u>Id.</u> at 408-09. One of the deputies contacted his superiors to notify them that he had arrested Freeman on the offense of hindering apprehension and was informed that he could not search her house without a warrant or arrest Freeman. <u>Id.</u> at 409. Freeman claimed that she was in the vehicle without air conditioning for between thirty and forty-five minutes and that the deputies refused her access to her heart medication even though they knew she had a heart condition. <u>Id.</u> In ruling on Freeman's Fourth Amendment claim, the court found that "a reasonable person in her position would believe that her freedom was restrained to a degree typically associated with arrest" and that the deputies lacked probable cause for an arrest. <u>Id.</u> at 413.

However, the decision was not based on the conditions during her detention. The court focused on the lack of probable cause to arrest Freeman. Freeman was told that she was being put under arrest when she was handcuffed and put into the police vehicle. <u>Id.</u> at 409. On those facts alone, a reasonable person would believe she was under arrest. Here, in contrast, Defendant

39

Gallegos informed Plaintiff that he would be detained until Officer H. Castro completed an investigation. The officers released Plaintiff upon the conclusion of the investigation. Nothing during the detention would have caused a reasonable person in Plaintiff's position to believe that the investigative detention had become a formal arrest. Because the detention was reasonable, the law enforcement objectives took primacy over Plaintiff's right to avoid retaliation from First Amendment conduct.

The summary judgment evidence does not support a finding of constitutionally impermissible conduct. Therefore, the qualified immunity inquiry ends and summary judgment should be granted.[157]

2. <u>Defendant Montelongo on October 31, 2011</u>

Defendants move for summary judgment on the claims related to the incident on October 31, 2011. They contend that Defendant Montelongo had very little interaction with Plaintiff and that Plaintiff cannot show that any of the events related to Plaintiff's detention were attributable to Defendant Montelongo. To the extent Plaintiff's claim is based on the citation for violation of Ordinance 28-33, Defendants argue that Defendant Montelongo is entitled to qualified immunity. Plaintiff argues that contested

---

[157]     Plaintiff cites <u>Morse v. Frederick</u>, 551 U.S. 393, 400 n.1 (2007), as holding that qualified immunity shields officers from money damages only and argues that, even if Defendant Gallegos is entitled to qualified immunity, Plaintiff's requests for declaratory and injunctive relief would remain pending. Because the court resolved the issue in Defendant Gallegos' favor on the first step of qualified immunity analysis, the lack of a constitutional violation, the court finds that the Section 1983 claim against Defendants Gallegos, City, and McClelland based on the May 16, 2011 incident should be dismissed in its entirety.

facts prevent summary judgment, specifically denying that he
entered the street and postulating that the reason for his
detention was his attempt to videotape the officer's interaction
with Stokes.

The court agrees that the question of Plaintiff's location at
the time of his detention is a genuine issue of material fact that
prevents summary judgment as to the seizure of Plaintiff.
Defendant Montelongo and Plaintiff disagree as to whether Plaintiff
was in the street at the time that Montelongo grabbed him, which
led to Plaintiff's resistance and the subsequent detention.    If
Plaintiff was in the street, Defendant Montelongo's effort to
protect Plaintiff and the drivers on the street was a valid
exercise of police powers.   Both the First and Fourth Amendment
yield to police protection in that circumstance.

If, however, Plaintiff was not in the street, Defendant
Montelongo was not justified in grabbing his arm, much less seizing
him.   Plaintiff's allegation that he was taken to the ground and
handcuffed as he began to videotape the incident then raises the
question whether he was detained in retaliation for exercising a
First Amendment right[158] and calls into question the reasonableness
of the seizure of Plaintiff.

Accepting Plaintiff's version for purposes of summary judgment

---

[158]    The evidence does not suggest that Defendant Montelongo harbored any
retaliatory animus.   In fact, he told Plaintiff and Stokes that they had the
right to preach.  However, the court need not reach that issue at this time.

analysis, the court spots Plaintiff the first step of the qualified immunity standard, that Defendant Montelongo's conduct violated Plaintiff's constitutional rights.  The second question is whether Defendant Montelongo's actions were objectively reasonable in light of clearly established law at the time of the violation. Notwithstanding the lack of a dispute regarding the state of the law at the time, the question of reasonableness still can only be answered after a jury determines whether Plaintiff was in the street.  Although qualified immunity protects Defendant Montelongo even if he made a mistake,[159] it will not protect him if a reasonable officer in his position would not have perceived the situation as he did.  Thus, the jury must assess the facts and determine what actually happened before a determination can be made on the reasonableness of Defendant Montelongo's actions.

Regarding the seizure of Plaintiff's shofar attendant to citation for violation of Ordinance 28-33, the court finds no dispute of fact on the record.  Defendant Montelongo, who did not know of the shofar's religious significance at the time, had probable cause to believe that the shofar violated Ordinance 28-33 and consulted other officers prior to citing Plaintiff and confiscating the shofar.  Plaintiff has failed to produce any

---

[159]    Plaintiff cites to Defendant Montelongo's deposition testimony where he stated that "citing [Plaintiff] for the possession of his shofar was a 'mistake.'"  Doc. 65, Pl.'s Resp. to Defs.' Mot. for Summ. J. p. 33 (citing Doc. 53-4, Ex. 3 to Defs.' Mot. for Summ. J., Def. Montelongo's Dep. p. 71). Qualified immunity protects officers from mistakes of law, mistakes of fact, and mistakes of mixed law and fact.  Pearson, 555 U.S. at 231.

contrary evidence to show that the confiscation was constitutionally improper. Therefore, Defendant Montelongo is entitled to qualified immunity for seizure of Plaintiff's shofar.

Summary judgment should be granted on the First and Fourth Amendment claims as they relate to the seizure of the shofar but not as they relate to the seizure of Plaintiff.

### 3.  Defendant Cisneros on January 14, 2012

Only Defendants move for summary judgment on the claims related to the incident on January 14, 2012. They contend that Defendant Cisneros is entitled to qualified immunity because he acted with reasonable suspicion in detaining Plaintiff and with probable cause in arresting Plaintiff. Plaintiff argues that contested facts prevent summary judgment, specifically denying that he disregarded Defendant Cisneros' orders and contending that he was treated differently than others who were not seized despite being in the street.[160]

The court finds that the facts related to this incident cannot be determined without drawing inferences, albeit slight inferences. Defendant Cisneros and Plaintiff disagree as to whether Plaintiff complied with Defendant Cisneros' orders and whether Plaintiff

---

[160]    Plaintiff also argues that Defendants offer only hearsay to prove that the race official requested police assistance on the basis that Plaintiff and Stokes were trying to disrupt runners and that they were uncooperative with another police officer. These facts are not material to Plaintiff's detention and subsequent arrest. Neither the detention nor the arrest was based on the initial reason for Defendant Cisneros' arrival or his initial interaction with Plaintiff and Stokes.

reentered the street immediately prior to his arrest.

As to Plaintiff's initial detention, Plaintiff was following Defendant Cisneros as he escorted Stokes and was videotaping the officer and Stokes.  After Defendant Cisneros reached his police vehicle, he turned to Plaintiff and ordered him to "go away" and not to get near the police vehicle.[161]  The video suggests that Plaintiff began to back up slowly.  Defendant Cisneros, apparently not satisfied, detained Plaintiff after Plaintiff protested that he was doing nothing wrong.  An inference must be drawn concerning Plaintiff's compliance with Defendant Cisneros' order.  If Plaintiff was sufficiently in compliance, Defendant Cisneros lacked reasonable suspicion that Plaintiff was disobeying his order and, thus, lacked a legal basis for Plaintiff's detention.  If, on the other hand, the proper inference is that Plaintiff was disobeying the order, reasonable suspicion supported the temporary detention.

The same is true with Plaintiff's arrest.  The video suggests that Plaintiff continued into the street and toward Defendant Cisneros' police vehicle as Defendant Cisneros warned him to stay out of the street.  Defendant Cisneros did not complete his warning before arresting Plaintiff.  Plaintiff's present denial that he was in the street at that time is blatantly contradicted by his own remark on the video that he was only crossing the street.  See

---

[161]    Doc. 66, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J., Video of Jan. 14, 2012 Incident.

44

Scott v. Harris, 550 U.S. 372, 378, 380 (2007)(instructing courts not to adopt the nonmovant's version of the facts for summary judgment analysis if his account is "blatantly contradicted" by the record and discussing a videotape that "clearly contradicts the version of the story" told by the plaintiff).  However, it cannot be determined without inference whether he was attempting to comply with Defendant Cisneros' orders.  The time within which Defendant Cisneros' partial warning and the arrest occurred is a matter of no more than a second or two.  Also, only inferences can resolve whether Plaintiff remained bound by Defendant Cisneros' prior order to stay away from the police vehicle and whether that order was violated by Plaintiff.  These disputes must be resolved by the fact finder.

As with the October 31, 2011 incident, the court accepts Plaintiff's version and allows all inferences in his favor.  The court therefore finds that Plaintiff has presented summary judgment evidence of a detention and an arrest, each of which was not legally justified.  The lack of legal justification for the seizures of Plaintiff implicates both the First and Fourth Amendment.[162]  For consideration on summary judgment, Plaintiff has met the requirement of demonstrating a constitutional violation.

---

[162]    The evidence does not suggest that Defendant Cisneros harbored any retaliatory animus but, rather, that he acknowledged Plaintiff's First Amendment right to share his beliefs publicly.  This issue remains for another day if the jury resolves the fact dispute in Plaintiff's favor.  Additionally, Plaintiff's assertion that he was treated differently from others need not be addressed at this time.

As the question of clearly established law is not at issue here either, the same factual disputes prevent the court from finding that Defendant Cisneros acted reasonably under the circumstances.

Plaintiff has failed to produce any evidence suggesting that the confiscation of his shofar in connection with a citation for violation of Ordinance 28-33 was unconstitutional. Defendant Cisneros, who was not aware of the shofar's religious significance at the time, is entitled to qualified immunity for its seizure.

Summary judgment should be granted on the First and Fourth Amendment claims as they relate to the seizure of the shofar but not as they relate to the seizure of Plaintiff.

**C.   Enforcement of Defendant City's Ordinance 28-33**

Public streets and sidewalks are considered "traditional public fora" that are "held in trust for the use of the public" for "assembly, communicating thoughts between citizens, and discussing public questions." McCullen, 134 S. Ct. at 2529 (quoting Pleasant Grove City v. Summum, 555 U.S. 460, 469 (2009)). The government's authority to restrict speech in those public locations is very limited. Id. (quoting United States v. Grace, 461 U.S. 171, 177 (1983)). Nevertheless, the government may regulate features of speech unrelated to its content, including "reasonable restrictions on time, place, or manner of protected speech" as long as those restrictions are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels

46

for communication of the information." <u>McCullen</u>, 134 S. Ct. at 2529 (quoting <u>Ward</u>, 491 U.S. at 791)(internal quotation marks omitted).   A constitutional regulation does not "burden substantially more speech than is necessary to further the government's legitimate interests." <u>Id.</u> (quoting <u>Ward</u>, 491 U.S. at 799).   "[W]hen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." <u>Hill</u>, 530 U.S. at 726.

To succeed on an as-applied challenge, the plaintiff must show that the law has in fact been unconstitutionally applied to him. <u>McCullen</u>, 134 S. Ct. at 2534.   "Specifically, when someone challenges a law as viewpoint discriminatory but it is not clear from the face of the law which speakers will be allowed to speak, he must show that he was prevented from speaking while someone espousing another viewpoint was permitted to do so." <u>Id.</u>

Plaintiff seeks summary judgment on his claim that Ordinance 28-33, which prohibits carrying signs of a certain size, sticks, poles, and other objects at demonstrations or other similar events, is unconstitutional as applied to Plaintiff.   Plaintiff concedes, implicitly if not explicitly, that the ordinance is content neutral on its face, that Defendant City has a legitimate governmental interest for its enactment, and that his shofar fits within the

parameters of the ordinance.  However, Plaintiff takes issue with the failure of the ordinance to define the words "demonstration," "rally," and "public assembly," arguing that it allows arbitrary and discriminatory application by police officers.  Plaintiff argues that persons in parades are not subject to the ordinance, diminishing the credibility of the rationale for its enactment. The statute is not narrowly tailored to its interest in safety, according to Plaintiff, because it bans the use of musical and religious instruments for peaceful purposes.  Finally, Plaintiff contends that the ordinance is used overwhelmingly against street preachers and homeless individuals.

Defendants argue that the ordinance is content neutral and that the only times that Plaintiff has been cited out of the thousands of times he has sounded his shofar while preaching in public were situations in which HPD was called to respond to disturbances.  Defendants further contend, citing Texas v. Johnson, 491 U.S. 397, 404 (1989), that Plaintiff's sounding the shofar is not protected expressive conduct because the likelihood is not great that his message would be understood by those viewing it.

Challenges to the constitutionality of an enactment of any sort are complex legal considerations that have occupied the elite minds of Supreme Court Justices for many, many years.  Plaintiff's citation to a few general legal principles regarding the protection of free speech activities in public fora and the restraints placed

48

on governments in regulating speech hardly give the issue its due and do not serve as a sufficient legal basis for finding Ordinance 28-33 unconstitutional as applied to Plaintiff.

Plaintiff fails to demonstrate that he was prevented from speaking while someone else with different views was permitted to speak. Plaintiff attacks the vagueness of the statute regarding the number of persons who must be gathered for its enforcement, not the unconstitutional application based on viewpoint. Plaintiff's only example of when the ordinance is not applied is parades. Because the variety of viewpoints expressed in parades can be infinite, this example fails to satisfy the requirement of disparate enforcement. The evidence of enforcement against homeless persons, who are expressing a viewpoint different from Plaintiff, goes no further to help his argument that his viewpoint is being singled out for enforcement of the ordinance. Plaintiff produced no evidence that the ordinance has been used against his speech and not against others.

Additionally, Plaintiff's argument that it is not narrowly tailored because it prohibits the peaceful use of religious and musical instruments falls flat. The ordinance is a manner restriction on the use of sticks, boards, poles, staves, rods, planks, pipe, studs, case, staffs, slats, and similar objects when participating in a demonstration or similar events. Plaintiff's shofar is an animal horn that is approximately three and one-half

49

feet long and pointed.[163]   The government's interest in public safety strongly favors the exclusion of any type of object that could be used as a weapon in the settings listed, where emotions may run high.   The restriction is reasonable.

Furthermore, the ordinance leaves open ample alternative channels for Plaintiff to express his views.   Although Plaintiff contends that the ordinance could be enforced against him when he is sounding his shofar by himself in public, that has not been the case.   In both of the two incidents when he was cited, he was with other individuals.   On October 31, 2011, he was with three other street preachers.   On January 14, 2012, Plaintiff was at the Houston Marathon, a public assembly, with one other street preacher.   In both cases, HPD responded to calls of disturbances involving Plaintiff.   The ordinance has not been applied to Plaintiff in a manner that burdens substantially more speech than is necessary to further Defendant City's safety goals.

Summary judgment should be denied on this claim.

**D.   Defendant City's Liability**

A city may be held liable under Section 1983 only for its own illegal acts, not pursuant to a theory of vicarious liability. Connick v. Thompson, __ U.S. __, 131 S. Ct. 1350, 1359 (2011).   To succeed on a claim under Section 1983, the plaintiff must

---

[163]   See Doc. 53-6, Ex. 4-C to Defs.' Mot. for Summ. J., Citation Dated Jan. 14, 2012.

demonstrate that the city "had a policy or custom, of which . . . a [municipal] policymaker [could] be charged with actual or constructive knowledge" that acted as the moving force behind a constitutional violation. <u>World Wide Street Preachers Fellowship v. Town of Columbia</u>, 591 F.3d 747, 756 (5th Cir. 2009)(citing <u>Pineda v. City of Houston</u>, 291 F.3d 325, 328 (5th Cir. 2002)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." <u>Connick</u>, 131 S. Ct. at 1359.

Courts have recognized that, under limited circumstances, the failure to train or to supervise its employees may give rise to local-government liability under Section 1983. <u>See</u> <u>id.</u>; <u>Zarnow v. City of Wichita Falls, Tex.</u>, 614 F.3d 161, 169, 170 (5th Cir. 2010). In failure-to-train cases, a plaintiff must prove the inadequacy of the training policies and procedures, deliberate indifference to the constitutional rights of its citizens in adopting the policies and procedures, and causation. <u>Zarnow</u>, 614 F.3d at 170; <u>see also</u> <u>Connick</u>, 131 S. Ct. at 1359 (quoting <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 388 (1989)). In order to show deliberate indifference by the municipality, a plaintiff must generally show a pattern of similar constitutional violations caused by the lack

of training or supervision.[164]  _Connick_, 131 S. Ct. at 1359.  Courts repeatedly emphasize how very high the standard of proof is to impute liability in these cases.  _See, e.g., Connick_, 131 S. Ct. at 1360.

Where the question is not whether the officers received any training in the constitutional requirements, but whether the officers received adequate training, the plaintiff cannot rely on proof that additional training would have created a better officer response or would have reduced the likelihood of a constitutional violation but must prove that the "officers were so untrained as to be unaware" of constitutional limitations.  _Pineda_, 291 F.3d at 333; _see also World Wide Street Preachers Fellowship_, 591 F.3d at 756 (quoting _Harris_, 489 U.S. at 390, as referring the need for more or different training as obvious).  The Supreme Court has cautioned, "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  _Connick_, 131 S. Ct. at 1359.

A city may also be liable if "authorized policymakers approve a subordinate's decision and the basis for it."  _World Wide Street Preachers Fellowship_, 591 F.3d at 755 (discussing _City of St. Louis_

---

[164]    In extreme circumstances, a single act by an officer may form the basis for liability if "the 'highly predictable' consequence of a failure to train would result in the specific injury suffered[] and . . . the failure to train represented the 'moving force' behind the constitutional violation." _Roberts v. City of Shreveport_, 397 F.3d 287, 295-96 (5th Cir. 2005)(quoting _Brown v. Bryan Cnty., Okla._, 219 F.3d 450, 461 (5th Cir. 2000), but distinguishing _Brown_ as a case in which the deputy received no training at all).

v. Proprotnik, 485 U.S. 112, 127 (1988)).  However, ratification is not applied to impute liability except in extreme factual situations.  Id. (citing Peterson v. City of Fort Worth, Tex., 588 F.3d 838, 848 (5th Cir. 2009)).  The plaintiff must prove that the policymaker approved the an officer's decision and the unconstitutional basis for it.  City of St. Louis, 485 U.S. at 127.

Defendants seek summary judgment on the claims against Defendant City because Plaintiff has failed to identify a formal municipal policy or establish a pattern significant enough to establish a widespread custom.  In his response brief,[165] Plaintiff challenges the application of Ordinance 28-33 and the policy of allowing an officer, at his discretion, to place someone in handcuffs while conducting an investigation.  Plaintiff also contends that Defendant City failed to train its officers on the application of Ordinance 28-33 to individuals peacefully possessing a religious instrument and that Defendant City ratified Defendant Officers' actions by not taking any action to counsel or discipline them.

Although Plaintiff provides quite a laundry list of allegedly

---

[165]    In his complaint, Plaintiff alleged that Defendant City had a policy or custom of selectively prohibiting the sounding of a shofar and the use of a video camera, that it had a policy or custom of applying its arrest policy and Ordinance 28-33 unconstitutionally, and that it had a policy or custom of inadequately training and supervising its officers.  There is overlap between those policy/custom allegations raised in Plaintiff's complaint and those discussed in his response brief.  However, to the extent that Plaintiff did not discuss all of the alleged policies/customs in his response brief, the court considers them abandoned.  The court does, however, address the allegation of ratification, raised for the first time in Plaintiff's response brief.

unconstitutional policies and/or customs, Plaintiff cites only to evidence related to the incidents in this case. Plaintiff provides absolutely no evidence of a pattern of similar incidents constitutionally injuring citizens. Absent a pattern of the unconstitutional application of either Ordinance 28-33 or the policy of handcuffing an individual held in detention, the court cannot charge the policymaker with actual or constructive knowledge of an unconstitutional custom.

To the extent that Plaintiff is attempting to use the three incidents in this action as a pattern, random acts or isolated incidents are insufficient to establish a pattern. Even if the court found constitutional violations in all three incidents in this case, three arguably similar incidents over the period of about eight months in Houston does not provide notice of a pattern significant enough to rise to the level of deliberate indifference. See Pineda, 291 F.3d at 329 (holding that eleven incidents in Houston was not enough create a fact issue on pattern); Fraire v. City of Arlington, 957 F.2d 1268, 1278 (5th Cir. 1992)(stating that the pattern must be significant enough to show "serious incompetence or misbehavior [that] was general or widespread throughout the police force"). Three incidents are not even significant as applied only to Plaintiff who has preached on the streets of Defendant City almost daily since at least 2010. See World Wide Street Preachers Fellowship, 591 F.3d at 754 (finding

that evidence of demonstrations without police interference on six dates outweighed evidence that the preachers had been interfered with on a few other occasions for purposes of establishing a widespread practice).

It goes without saying, that, in order to show that Defendant City made the decision to violate Plaintiff's constitutional rights in the manner alleged, Plaintiff must show that Defendant City had knowledge of a widespread practice *at the time of the incidents in this suit*. Otherwise, it cannot be said that Defendant City made the decision to violate Plaintiff's rights by tolerating a practice *of which it knew*. This logic was confirmed by the U.S. Supreme Court: "[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates." Connick, 131 S. Ct. at 1360 n.7 (quoting Harris, 489 U.S. at 395)(internal quotations marks omitted).

With regard to training, the only evidence that Defendant City's procedures were inadequate is that it did not include the allegedly proper application of Ordinance 28-33 to persons peacefully possessing a religious instrument and, even after the October 31, 2011 incident, did not offer that training to all of the police force. However, there is evidence that both of the officers enforcing Ordinance 28-33 were trained in the Houston Police Academy and received special training related to handling

protests and that both were aware of Plaintiff's First Amendment rights.  Evidence of an absence of specific training regarding the use of religious instruments is insufficient to demonstrate a deliberate indifference of the constitutional rights of citizens.

Plaintiff's ratification allegation also fails.  Defendant City dismissed one complaint after Plaintiff failed to complete necessary documentation and investigated the other, finding no wrongdoing.  Neither the actions of Defendant Montelongo nor those of Defendant Cisneros, even if unconstitutional, were sufficiently extreme to establish an official policy or custom.

Summary judgment should be granted on all claims asserted against Defendant City.

**E.   Defendant McClelland's Liability**

To hold a government official liable in his individual capacity under Section 1983, a plaintiff must allege facts sufficient to show that the official violated the Constitution through his own individual actions.  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  If the government official was not personally involved in the constitutional violation, his acts must have been causally connected to the constitutional violation alleged to hold him liable.  Roberts v. City of Shreveport, 397 F.3d 287, 291-92 (5th Cir. 2005)(quoting Woods v. Edwards, 51 F.3d 577, 583 (5th Cir. 1995)).  In other words, supervisors cannot be held liable under any theory of vicarious liability.  Roberts, 397 F.3d at 292

56

(quoting <u>Thompson v. Upshur Cnty., Tex.</u>, 245 F.3d 447, 459 (5th Cir. 2001)).

An official may be found liable under Section 1983 for a failure to supervise or train when the plaintiff can show that the official failed to supervise or train the subordinate, that the failure caused the violation of the plaintiff's rights, and that the failure amounts to deliberate indifference. <u>Goodman</u>, 571 F.3d at 395. To show that an official acted with deliberate indifference, a plaintiff must demonstrate that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that he drew that inference. <u>Goodman</u> 571 F.3d at 395. As with municipal liability, the plaintiff generally must demonstrate a pattern of similar violations in order to establish deliberate indifference. <u>Id.</u>; <u>see also Estate of Davis ex rel. McCully v. City of N. Richland Hills</u>, 406 F.3d 375, 383 (5th Cir. 2005)("Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question. That is, notice of a pattern of *similar* violations is required.")(footnote omitted).

Defendants argue that Plaintiff cannot produce any evidence that Defendant McClelland was personally involved in any of the incidents or that he was aware of any facts from which he could or did draw inference that any of the accused officers posed a substantial risk of violating the First or Fourth Amendment rights

of citizens.  They further argue that the nothing in the past conduct of the three officers points to the likelihood that any would violate constitutional rights and that all three were properly trained.  To the extent Plaintiff seeks to hold Defendant McClelland liable as a policymaker, Defendants argue, Plaintiff has not produced evidence of a custom, policy or practice that led to the deprivation of Plaintiff's constitutional rights.

Plaintiff argues that Defendant McClelland has not provided HPD officers with adequate supervision and training, citing Defendant McClelland's lack of familiarity with Ordinance 28-33 and lack of awareness of any training specific to that Ordinance, as well as a lack of training about the lawfulness of videotaping officers.  Plaintiff also takes issue with Defendant McClelland's lack of knowledge, expressed at his deposition, regarding the IAD process, the number of complaints received by HPD, the number lawsuits HPD had faced, and the number of times he had faced legal action.  Defendant McClelland's inability to recall the protocol for handcuffing arrestees is cited as evidence of a failure to supervise and/or train.

All of Plaintiff's arguments are mere smoke.  Even if the court spots Plaintiff the first element of a failure to supervise or train claim, to wit, that Defendant McClelland failed to

supervise or train the officers involved,[166] Plaintiff failed to produce evidence indicating that the failure caused the violation of Plaintiff's rights or that the failure amounted to deliberate indifference. Plaintiff discusses Defendant McClelland's inability to provide information on the number of complaints but wholly fails to show a pattern of similar violations.

The only policy cited by Plaintiff as attributable to Defendant McClelland as a policymaker is the enforcement of Ordinance 28-33. Because the court finds Ordinance 28-33 withstands Plaintiff's constitutional challenge, the court necessarily finds that enforcement of the ordinance raises no policy concerns.[167]

Summary judgment should be granted on all claims against Defendant McClelland.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendants' motion be **GRANTED IN PART AND DENIED IN PART** and that Plaintiff's motion be **DENIED**.

The Clerk shall send copies of this Memorandum and

---

[166] This is contradicted by the training records of all three Defendant Officers and, with regard to the incidents on October 31, 2011, and January 14, 2012, by the consultation of senior officers and/or the district attorney. Defendant Cisneros is a supervisor who was called to the scene of the January 14, 2012 incident.

[167] The court need not and does not make any legal or factual finding whether Defendant McClelland is responsible for enforcement of city policies or whether responsibility for enforcement of an ordinance can be considered a policy attributable to the chief of policy.

Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 26th day of January, 2015.


_____
U.S. MAGISTRATE JUDGE